IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| J.V. *b/n/f* JOSE VEGA AND | § | |
| MARGARITA VEGA | § | |
|     Plaintiffs, | § | |
| | § | Case No. 1:18-cv-008 |
| v. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, and | § | |
| ENRIQUE RODRIGUEZ, | § | |
|     Defendants. | § | |

## PROPOSED JOINT PRETRIAL ORDER

### REQUIRED CONTENTS OF THE JOINT PRETRIAL ORDER

1.  **Appearance of Counsel.**

    J.V. b/n/f Jose Vega and Margarita Vega, **Plaintiffs**
    Counsel:
    **Anthony O'Hanlon**
    111 S. Travis St.
    Sherman, Texas 75090
    903.892.9133
    **Martin Cirkiel**
    1901 E. Palm Valley Boulevard
    Round Rock, Texas 78664
    512.244.6658

    Brownsville Independent School District and Enrique Rodriguez, **Defendants**
    Counsel:
    **Baltazar Salazar**
    8814 Brae Acres
    Houston, Texas 77074
    **Miguel Salinas**
    1900 Price Road, Suite 205

1

    Brownsville, Texas 78521
    956.698.6379

2. **Statement of the Case.**

J.V. was born with cerebral palsy and is wheelchair bound. He is disabled within the meaning of the law which applies to this case.

Plaintiffs are bringing a claim against Brownsville Independent School District ("Brownsville ISD") under the Americans With Disabilities Act, 42 U.S.C. §12131, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

These laws serve the same purpose to ensure that reasonable accommodations are provided to people with disabilities when necessary and to otherwise ensure that people with disabilities are not discriminated against.

The purpose of these laws is to overcome the historical isolation and segregation of people with disabilities from all areas of mainstream social and economic life, to allow people with disabilities the same quality of opportunity as others. 42 U.S.C. 12101(a)(2). But the intent of these laws is to address not just discrimination which is the product of animus or evil intent, but discrimination which is more often the product of thoughtlessness and indifference other words, of benign neglect.

The ADA says in relevant part that a qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity 42 U.S.C. § 12132.

The Rehabilitation Act says no otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance..." The Defendant admits that the Rehabilitation Act applies as they receive federal financial assistance.

In this case, you may assume that "J.V." is "disabled" within the meaning of the Rehabilitation Act, 29 U.S.C. §794, and the ADA, and is "otherwise qualified" to attend Brownsville ISD's schools. You may also assume that Brownsville ISD receives the kind of federal financial assistance that the Rehabilitation Act, 29 U.S.C. §794 requires and that it is a public facility, that the ADA requires.

J.V. is not able to take care of his own toileting needs. He requires a number of reasonable accommodations so as to be able to enjoy the benefits of a public education to the same extent as his non-disabled peers.[1]

One such benefit is to receive services provided by the public school in a safe and non-hostile environment.[2]

All employees / agents of Defendant Brownsville ISD were working in the course and scope of their employment all relevant times herein. The School District is liable for the failures of their staff members under the ADA and Section 504.[3]

For J.V. to satisfy the elements of a claim against the Defendant School District related to the ADA or Section 504[4] he must (1) have a disability; (2) be excluded from participation in or denied the benefits of services, programs, or activities for which a public entity is responsible, or was subjected to discrimination by the public entity and (3) such exclusion, denial of benefits, or discrimination was by reason of the student's disability.[5]

In order to recovery compensatory damages he must show the discrimination was intentional.[6]

Intentional discrimination under Section 504 or ADA may be found when School District Staff display professional bad faith or gross misjudgment of the child's educational plan.[7]

---

[1]. Estate of Esquivel v. Brownsville Indep. Sch. Dist., 1:16-cv-00040, 72 IDELR 270 (S.D. TX., September 11, 2018) [finding discrimination based upon disability when school district failed to provide accommodations to student with severe disabilities at a swimming pool].

[2]. Taylor v. Richmond (Texas) State Living Center, 2012 U.S. Dist. LEXIS 170190 *16-17 (S.D. Tx., November 30, 2012) [failure to keep a person with disability safe rises to the level of intentional discrimination].

[3]. Delano-Pyle v. Victoria County, Texas, 302 F.3d 567(5th Cir. 2002).

[4]. Hainze v. Richards, 207 F.3d 795, 799 (5th Cir.2000) ["... jurisprudence interpreting either section is applicable to both"].

[5]. Delano-Pyle v. Victoria County, Texas, 302 F.3d 567(5th Cir. 2002).

[7]. D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist., 629 F.3d 450, 455 (5th Cir. 2010).

A school district is liable under the Rehabilitation Act and the ADA if it refused or failed to provide reasonable accommodations for a handicapped plaintiff to receive the full benefits of the school program.

A school district refuses reasonable accommodations when it fails to exercise professional judgment or grossly deviates from the child's accommodation plan, or misjudges the child's needs[8] in response to changing circumstances or new information, even if the district has already provided an accommodation based on an initial exercise of such judgment. The school district in question need not literally "refuse" to make a reasonable accommodation.

The purpose of laws which allow for an award of damages is to give, as far as possible, fair and just compensation for a Plaintiff's loss where this loss resulted from a Defendant's violation of the Plaintiff's legal rights. If you find that the Plaintiff has suffered any loss or injury which was caused by the Defendant's actions or its failure to act, then you must award the Plaintiff sufficient damages to compensate him for any injuries caused by the Defendants.

In regard to damages, the purpose of compensatory damages is to make whole an injured party. Although compensatory damages are meant to make an injured party whole, they are not limited only to monetary costs which a party has borne. You may award compensatory damages under the ADA or the Rehabilitation Act, even if Plaintiffs injuries are purely emotional, consisting for example, of personal humiliation, mental anguish or suffering pain.

The law does not require a Plaintiff to prove the amount of his damages with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit. You must use your own common sense and discretion, drawing reasonable inferences as you may deem appropriate from the facts in evidence.

3. **Jurisdiction.** 28 U.S.C.A. 1331, 1343, 42 U.S.C. 2000d et. seq, , and 28 U.S.C. 1367.

4. **Motions.** Plaintiffs' Motion in Limine

   Plaintiffs' First Supplemental Motion to Exclude Investigations and to Strike Investigative Opinions

5. **Contentions of the Parties.** Plaintiffs claim that Defendant failed to properly provide reasonable toileting accommodations to J.V. and to keep him safe.

6. **Admissions of Fact.**

---

[8]. E.M. b/n/f Guerra v. San Benito Consolidated School District, 374 F. Supp. 3d 616, 624-625 (S.D. Tex. 2019).

4

   a. J.V. is a person with a disability.
   b. The Defendant and its employees / agents knew J.V. was a person with a disability.
   c. All of Defendant's employees/agents were acting in the course and scope of their employment/agency at all times relevant to this case.
   d. Defendant, through its employees/agents knew that J.V. required reasonable accommodations during toileting.
   e. These reasonable accommodations included needs for:
      i. Specially trained staff
      ii. Sufficient number of staff
      iii. A changing surface that was commensurate with J.V.'s unique and individualized needs
      iv. A changing surface that was safe
   f. On March 29, 2016, Defendant took J.V.'s class on a field trip to a local zoo and to Golden Corral.
   g. Defendant did not follow the rules of J.V.'s "plan" for accommodating his toileting needs on March 29, 2016.
   h. Defendant took J.V. to the bathroom at Golden Corral and did not follow J.V.'s "plan" for accommodating his toileting needs on March 29, 2016.
   i. J.V. was diagnosed and treated for a fractured distal femur on March 29, 2016.

**More Specifically plaintiff proposes the following facts:**
   1. The Brownsville Independent School District ("the "School District") must follow the requisites of the Americans With Disabilities Act, 42 U.S.C. §12131(1) ("ADA") as it is a public facility covered by the Act.
   2. The School District receives federal funding and must also follow the requisites of Section 504 of the Rehabilitation Act of 1973, (the Rehab Act") 29 U.S.C. §794(b)(2)(B).
   3. J.V. was born on February 12, 2004. He lives with his parents, Juan and Margarita Vega.[1]
   4. During a significant period that makes the basis of this complaint he was a student at Lucio Middle School in Brownsville Independent School District.
   5. On March 29, 2016 he was taken with his classmates to an outing at the Porter Zoo in Brownsville.
   6. When he came home from school that day he was in pain and his mother took him to the Valley Regional Hospital. The medical record reflects that J.V. had an "Acute distal femoral metaphysis fracture with 50 dorsal angulation.[2]

---

[1]. Vega BISD 015.

[2]. Vega BISD 012-014, 019.

7. Further, the femoral condyles were somewhat rotated and were perpendicular to the tibia plateau.[3]
8. At the hospital it was determined he was 4'9" tall and weighed 27.27 kilograms (or 60.12 pounds).[4]
9. He had surgery the next day.[5]
10. J.V. has been diagnosed with cerebral palsy[6] due to curvature of his spine. He has an orthopedic impairment, a speech impairment and a low IQ,[7] also known as an Intellectual Disability.[8]
11. Prior to the incident he was able to ambulate on his own at home.[9]
12. He also was able to transport himself at school but is very slow and would get tired quickly.[10]
13. He is considered a person with a disability as contemplated by the ADA, 42 U.S.C. §12102.
14. J.V. is also considered a person with a disability as contemplated by the Rehab Act, 29 U.S.C. §794(a), citing 29 U.S.C. §705(20).
15. Because of his disabling conditions J.V. was provided a number of accommodations to the environment at the School District.[11]
16. One accommodation was that J.V. was placed in a special classroom that is called a Life Skills Classroom.[12]
17. An important accommodation was that he had specially trained staff to oversee his education at school. The Special Education Director for the entire Brownsville Independent School District was Adrian Lipper. She provides

---

[3]. Vega BISD 034.

[4]. Vega BISD 023.

[5]. Vega BISD 030.

[6]. Adriana Lippa, Special Education Director for the School District, Deposition at p. 31, l. 13-20.

[7]. Lippa Deposition, p. 16, l. 3-10.

[8]. Formerly known as "Mental Retardation." Vega BISD 1898.

[9]. Vega BISD 016.

[10]. Vega BISD 1894; Lippa Deposition, p. 33, l. 7-9.

[11]. Vega BISD 1894; Lippa Deposition, p. 83, l. 10-25; p. 84, l. 1-25.

[12]. Vega BISD 1894; Lippa Deposition at p. 23, l. 1-12; Rojas, Classroom Special Education Teacher, Deposition at p. 5, l. 3-4.

|     |     |
| --- | --- |
|     | oversight to 53 campuses[13] |
| 18. | His classroom teacher was also specially trained as a Special Education Teacher. Her name was Ninfa Rojas.[14] |
| 19. | Also the classroom had its own bathroom.[15] |
| 20. | Another accommodation is that there is a very high number of staff per student.[16] |
| 21. | Another accommodation was J.V. was provided is termed Adaptive Physical Education (APE").[17] |
| 22. | One of his legs appears shorter than the other though that is because his leg has been drawn upwards into his hip.[18] His legs are very stiff. J.V. would often complain about pain in his leg.[19] He also has a left hip that would dislocate often.[20] |
| 23. | He can make sounds that are audible but he is hard to understand. His way of talking is like "slow motion."[21] |
| 24. | When his hip was hurting he would communicate by tapping his leg.[22] |
| 25. | He would also say that "mi pierna me duele."[23] |
| 26. | He did this almost every day.[24] Even so, staff were concerned enough that he was sent to the nurse on January 12, 2016 after some pain after P.E. Class and |

---

[13]. Lippa Deposition, p. 8, l. 18-25.

[14]. Rojas Deposition at p. 6, l. 18-19.

[15]. Lippa Deposition at p. 24, l. 21-25; p. 25, l. 1; Rojas Deposition at p. 6, l. 7, 16-19.

[16]. Lippa Deposition, p. 22, l. 19-21.

[17]. Lippa Deposition, p. 33, l. 14-19.

[18]. Margarita Vega Deposition, p. 10, l. 13-18; Jose Vega Deposition, p. 7, l. 21-25.

[19]. Vega BISD 1894; Rojas Deposition at p. 13, l. 1-7.

[20]. Margarita Vega Deposition, p. 15, l. 6-9.

[21]. Vega BISD 1894.

[22]. Rojas Deposition at p. 13, l. 11-12.

[23]. Rojas Deposition at p. 13, l. 11-16; translated as "my leg hurts."

[24]. Vega BISD 063.

    a few weeks later on March 3, 2016 when mother gave permission for staff to massage his leg.[25].

27. His Special Education Teacher, Ninfa Rojas reported her concerns about the pain in J.V.'s legs to the physical therapist, the adaptive physical education teacher and nurse.[26]
28. The District never developed a specific accommodation plan to address this issue.[27]
29. J.V. needs help in going to the bathroom.[28] He doesn't have the ability to clean himself so he needs staff to clean him[29].
30. One accommodation was that J.V. was to be placed on an adaptive toilet chair, which was placed on the toilet. With the use of such a chair, he would not have to be placed as far down, if it was not used. [30]
31. He needs personal care services at school for toileting purposes. Specifically, he needs someone to take his clothing off and put it back on and help cleaning up after using the bathroom.[31]
32. J.V. is currently wheelchair bound though he was on a standing program at school. In J.V.'s classroom it was five students for every staff member.[32]
33.. J.V. spent a significant time each day in a wheelchair.[33]
34. .During this period he would get stiff.[34]
35. One accommodation provided by the School District was a special table that

---

[25]. Vega BISD 141-142.

[26]. Rojas Deposition at p. 13, l. 20-25.

[27]. Rojas Deposition at p. 14, l. 6-9.

[28]. Vega BISD 1894; Rojas Deposition at p. 9, l. 16-24.

[29]. Margarita Deposition, p. 24, l. 1-8.

[30]. Lippa Deposition, p. 37, l. 10-24.

[31]. Vega BISD 1894

[32]. Vega BISD 1894; Rodriguez Deposition at p. 6, l. 5-6.

[33]. Rojas Deposition at p. 11, l. 20-22.

[34]. Rojas Deposition at p. 11, l. 23-25

|  |  |
|---|---|
|  | would be used to stretch his legs for a half hour a day.[35] |
| 36. | This accommodation was ordered by his physician.[36] |
| 37. | Two people were required to put J.V. on the stretching table.[37] |
| 38. | It is important not to stretch him too much.[38] |
| 39. | When he went to the bathroom two staff were required to take him out of the wheelchair.[39] |
| 40. | It was safest for J.V. to have two staff with him when using the toilet.[40] |
| 41. | The bathroom in the Life Skills Classroom had a special changing table. It was not like the type you would see in a restaurant but was an actual table with padding.[41] |
| 42. | One of the staff members who worked with J.V. in the Spring 2016 Semester in the classroom was a Teacher's Aide named Enrique Rodriguez. |
| 43. | Rodriguez started with the District in 2007 as a Teacher's Aide.[42] He starting working as a Security Officer for the Police and Security Department for the District in 2009 until 2012.[43] |
| 44. | While working as a Security Officer he was admonished for not shaving and not having a professional appearance at work. Additionally he was admonished for not wearing his assigned uniform as required. Moreover, he written up for raising his voice to a superior officer and for being argumentative and disrespectful. He was told further disciplinary action would lead to termination.[44] |

---

[35]. Rodriguez Deposition at p. 9, l. 6-9.

[36]. Lippa Deposition, p. 36, l. 14-22.

[37]. Rodriguez Deposition at p. 9, l. 14-16.

[38]. Rodriguez Deposition at p. 9, l. 19-25.

[39]. Rojas Deposition at p. 12, l. 15-17.

[40]. Rojas Deposition at p. 17, l. 1-3.

[41]. Lippa Deposition at p. 25, l. 15-25.

[42]. Vega BISD 962, 1053.

[43]. Vega BISD 1020, 1025.

[44]. Vega BISD 1019-1020.

45.  He left the Police Department and in 2013 he changed from security and started working in the Life Skills Program at the Lucio Middle School.[45] He was evaluated at the end of the school year. In 14 areas reviewed he received a 8 or below expectations in five of them. In these areas of deficiency it was noted he was overly aggressive which created a hostile environment for students and had a lack of professional behaviors.[46]

---

[45]. Vega BISD 969.

[46]. Vega BISD 1066-1068.

46. In 2014 he was working in Life Skills Program at the Lucio Middle School[47] and was evaluated at the end of the school year. In 21 areas reviewed he received a 2 or below expectations in 9 of them. In these areas of deficiency it was noted he did not fully participate in classroom activities and was re-directed in several situations because he was disrespectful to his co-workers.[48]
47. In 2015 he was working in Life Skills Program and was evaluated at the end of the school year. In 21 areas reviewed he received a 2 or below expectations in 5 of them. In these areas of deficiency it was noted he had a tendency to over react, needed improvement in working in a professional manner and his mannerisms were not acceptable.[49]
48. There was no evaluation completed for 2016.
49. At the time Rodriguez worked with J.V. in 2016 he weighed 315 pounds.[50]
50. Mr. Ben De Angel, the APE Teacher taught Rodriguez how to use the stretching table.[51]
51. The Special Education Director, Ms. Lippa noted it took special skill to take a child from a wheelchair to use the toilet.[52]
52. The Special Education Director, Ms. Lippa stated it was best practice to have two persons assist with a student who was in a wheelchair and need help in transfer to use the toilet.[53]
53. The Special Education Director, Ms. Lippa stated a Physical Therapist, or Occupational Therapist or nurse, was required to train staff on how to transfer a student from a wheelchair to the toilet.[54]
54. Among other things Rodriguez' job was to take J.V. to the bathroom that day and change his diaper.[55]
55. No one ever taught Rodriguez how to provide toileting services to a student like J.V.[56]

---

[47]. Vega BISD 965.

[48]. Vega BISD 1063-1065.

[49]. Vega BISD 1060-1062.

[50]. Rodriguez Deposition at p. 12, l. 1-3.

[51]. Rodriguez Deposition at p. 11, l. 1-6.

[52]. Lippa Deposition at p. 27, l. 2-4.

[53]. Lippa Deposition at p. 28, l. 5-8.

[54]. Lippa Deposition at p. 28, l. 16-21; p. 38, l. 7-13.

[55]. Rodriguez Deposition at p. 5, l. 14-21.

[56]. Rodriguez Deposition at p. 11, l. 12-14.

56. Nor was there a training module developed to help staff learn how to correctly take a student from a wheelchair to the toilet.[57]
57. During the time period Mr. Rodriguez worked with J.V. he never used the specially adapted toilet seat with him.[58]
58. On March 29, 2016 when J.V. was taken off the school bus that morning by his Aide, Angela Cruz Castillo he was not crying.[59]
59. On March 29, 2016 J.V. attended a school outing to the local zoo.[60]
60. The Special Education Director stated that to go on an outing with a student like J.V. there should be enough staff, bring his adaptive toilet chair and assure there are two staff to take him into the bathroom.[61] Staff should also bring a cushion.[62]
61. A changing table at a restaurant should only be used if it accounts for the child's weight.[63]
62. While at the zoo J.V. complained about pain in his leg to Mr. Rodriguez.[64]
63. He also complained to other staff about the pain[65] though in general he seemed to be enjoying himself.[66]
64. J.V. was able to tell staff when he needed to be changed.[67]
65. There was a bathroom at the zoo but staff decided not to use it before leaving.[68]
66. Afterwards he and other students went to Golden Coral to eat. J.V. was taken to the bathroom by a Teacher's Aide Rodriguez because he was wet.[69]

---

[57]. Lippa Deposition, p. 38, l. 14-16.

[58]. Rodriguez Deposition at p. 9, l. 1-5.

[59]. Castillo Deposition at p. 13, l. 20-22.

[60]. Vega BISD 063.

[61]. Lippa Deposition, p. 40, l. 11-25.

[62]. Lippa Deposition, p. 43, l. 12-14.

[63]. Lippa Deposition, p. 44, l. 1-4.

[64]. Rojas Deposition at p. 15, l. 11-12; Vega BISD 063.

[65]. Rojas Deposition at p. 15, l. 14-15; l. 23-25; Castillo Deposition at p. 5, l. 14-18.

[66]. Vega BISD 065.

[67]. Margarita Vega Deposition, p. 13, l. 20-24.

[68]. Rojas Deposition at p. 14, l. 12-14.

[69]. Castillo Deposition at p. 6, l. 14-16.

67. Rodriguez took him to the family restroom bathroom by himself.[70]
68. The bathroom was typical though it had a diaper changing table. The changing area was approximately 30" long by about 14" wide. The table also had a warning sign. Never to leave a child unattended. To "Avoid serious injury from falling or sliding out. Always use restraint system." "Designed for infants only. Age up to 3.5 years and weighing less than 50 lb. Keep one hand on child at all times."[71]
69. Rodriguez put J.V. on the changing table by himself.[72] He saw the table was marked safety first.[73]
70. Rodriguez decided he needed additional help.[74]
71. Ms. Castillo, another Teacher's Aide went into the bathroom to help.[75]
72. When she walked in she saw J.V. on the changing table.[76]
73. She also heard J.V. complain about his leg being in pain.[77]
74. J.V was complaining when Rodriguez was pulling up his diapers.[78]
75. At that time Castillo noticed that his legs were stiff.[79]
76. Rodriguez picked J.V. up from the table by himself and placed J.V. in the wheelchair by himself.[80] He did not say he belted J.V. onto to the table.
77. The Special Education Director stated that if staff are not trained correctly, it could affect the safety of J.V.[81]
78. When in the wheelchair J.V. also complained his shoes were too tight.[82]

---

[70]. Rodriguez Deposition at p. 12, l. 16-17.

[71]. Picture, Exhibits 1, 2 .

[72]. Rodriguez Deposition at p. 12, l. 18-25.

[73]. Vega BISD 070.

[74]. Rojas Deposition at p. 17, l. 7-10.

[75]. Castillo Deposition at p. 7, l. 13-15.

[76]. Castillo Deposition at p. 7, l. 18-20.

[77]. Castillo Deposition at p. 8, l. 22-25.

[78]. Castillo Deposition at p. 9, l. 7-10.

[79]. Castillo Deposition at p. 9, l. 13-14; p. 10, l. 1-19.

[80]. Castillo Deposition at p. 8, l. 20-21.

[81]. Lippa Deposition, p. 85, l. 1-7.

[82]. Castillo Deposition at p. 17, l. 23-25.

79. Before leaving Golden Coral Rodriguez again told Rojas that J.V. was in pain.[83]
80. Mrs. Rojas decided to wait until they returned to the school to deal with it.[84]
81. She wanted to send J.V. to the nurse's office.[85]
82. Upon return to the school J.V. was taken to the Joe D. Losoya, RN.[86] When the Nurse asked J.V. if he was pain J.V. raised his pants showing his that left knee was swollen.[87]
83. The nurse believed J.V. needed to see a doctor[88] for an MRI.[89]
84. The nurse called Ms. Rojas and told her that J.V. was crying and complaining a lot.[90]
85. After finishing with the nurse, J.V. was put on the bus going home by Mr. Rodriguez.[91]
86. J.V.'s mother received a call from the school nurse, Lulu Longoria, stating that J.V.'s knee was swollen.[92] Also, because of his pain she did not want to move him.
87. Mother reports that when J.V. came home from school that day he quieter than his usual jovial self and said he was in pain.[93]
88. After he got off the bus he pointed to his leg and said "mi pierna." [94]
89. When she picked him up out of the wheelchair to change him he cried. [95]

---

[83]. Rojas Deposition at p. 15, l. 17-18.

[84]. Rojas Deposition at p. 15, l. 18-19.

[85]. Rojas Deposition at p. 15, l. 18-19.

[86]. Castillo Deposition at p. 12, l. 7-14.

[87]. Vega BISD 072, 073, 077-078.

[88]. Vega BISD 53.

[89]. Vega BISD 070.

[90]. Vega BISD 63.

[91]. Castillo Deposition at p. 14, l. 12-14.

[92]. Vega BISD 063; Margarita Vega Deposition, p. 18, l. 3-17.

[93]. Margarita Vega Deposition, p. 20, l. 14-25.

[94]. Margarita Vega Deposition, p. 21, l. 3-8.

[95]. Margarita Vega Deposition, p. 23, l. 9-20.

90. When she carried him to the bed she cried even more.[96] She noticed his knee was very swollen and there was a dip in his leg above the knee.[97] She believed his leg was broken.[98]
91. Mrs. Vega called Mrs. Rojas who told her J.V. had complained about leg pain so she referred him to the school nurse.[99]
92. J.V.'s parents called an ambulance. When they showed up he was crying.[100] Right away the paramedics said it was broken.[101]
93. J.V. was brought to the hospital. The medical record reflects that J.V. had an "Acute distal femoral metaphysis fracture with 50 dorsal angulation.[102] Further, the femoral condyles were somewhat rotated and were perpendicular to the tibia plateau.[103] Moreover, that movement exacerbated the pain.[104]
94. The initial diagnosis opined the injury extended to the growth plate.[105] There was also a differential diagnosis that J.V.'s knee was dislocated.[106] It had never fractured before.[107]
95. Dr. Tijeres reported that the break occurred because force was used.[108]
96. Dr. Ashoka, M.D. with the Valley Regional Medical Center reported it was a bad fracture and happened recently.[109]

---

[96]. Margarita Vega Deposition, p. 25, l. 12-19.

[97]. Margarita Vega Deposition, p. 17, l. 5-17.

[98]. Vega BISD 063-064.

[99]. Vega BISD 063.

[100]. Margarita Vega Deposition, p. 31, l. 19-21.

[101]. Margarita Vega Deposition, p. 26, l. 10-13.

[102]. Vega BISD 019, 013-014.

[103]. Vega BISD 034,

[104]. Vega BISD 016.

[105]. Vega BISD 019, 033.

[106]. Vega BISD 020.

[107]. Jose Vega Deposition, p. 16, l. 13-15.

[108]. Jose Vega Deposition, p. 12, l. 9-14.

[109]. Vega BISD 058. THIS IS FROM A PD REPORT

| | |
|---|---|
| 97. | He was provided morphine for the pain.[110] |
| 98. | He was transferred to another hospital because he required a higher standard of care,[111] the Rio Grande Hospital and had surgery the next day.[112] |
| 99. | He was put in cast[113] and missed school for about two and a half months.[114] |
| 100. | During this period he missed out on his regularly scheduled Occupational Therapy, Physical Therapy, as well as Speech Therapy and Adaptive Physical Education.[115] |
| 101. | J.V. now has pins in his leg because of this injury. |
| 102. | Before the surgery J.V. was able to ambulate with a walker independently. |
| 103. | Since the surgery J.V. is no longer able to ambulate independently with a walker. |
| 104. | Since the surgery J.V. is only able to move through the environment by wheelchair. |
| 105. | Since the accident he can no longer tolerate standing.[116] |
| 106. | J.V. has stated that he was hurt when he was laid down.[117] |
| 107. | J.V has stated he was hurt by Mr. Rodriguez.[118] |
| 108. | J.V. stated Rodriguez used one hand to hurt him.[119] |
| 109. | That Rodriguez' hand was open.[120] |
| 110. | At the time J.V was questioned he was responding to open not leading questions.[121] |

---

[110]. Vega BISD 020; Jose Vega Deposition, p. 13, l. 14-21.

[111]. Vega BISD 013, 021.

[112]. Vega BISD 030; X-Rays at 221-226.

[113]. Vega BISD 046.

[114]. Vega BISD 053.

[115]. Vega BISD 1898.

[116]. Margarita Vega Testimony

[117]. Castillo Deposition at p. 24, l. 14-18.

[118]. Castillo Deposition at p. 24, l. 7-8.

[119]. Castillo Deposition at p. 25, l. 6-9.

[120]. Castillo Deposition at p. 25, l. 14-15.

[121]. Castillo Deposition at p. 25, l. 17-18.

       111. Rodriguez says J.V. is lying about being injured by him[122] but was not lying when J.V. said Rodriguez touched him in his private area.[123]

       112. Ms. Castillo states that J.V. is capable of telling someone if he is pain.[124]

       113. Ms. Castillo states that J.V. is capable of telling someone if he was hurt by another person.[125]

       114. His mother reports that J.V. knows the difference between right and wrong.[126] Mrs. Castillo reported that J.V. was not capable of lying.[127]

       115. After J.V. returned to school the District continued to have Rodriguez work with J.V. For the first time when his parents would try to change him at home J.V. would say "Don't touch me."[128]

7. **Contested Issue of Fact.**   Whether Defendant (through its employees/agents) injured J.V.

8. **Agreed Propositions of Law.**

    a. The parties have agreed to submit attorneys fees issues to the Court post verdict.

9. **Contested Propositions of Law.** State briefly the unresolved questions of law, with authorities to support each.

    Admissibility of:
        Brownsville ISD's police investigation file/conclusions
        CPS investigative file/conclusions

10. **Exhibits.**

    A. Attach an Exhibit List and make all listed exhibits available for examination by opposing counsel. Parties must mark each exhibit with the date and case number.

---

[122]. Rodriguez Deposition at p. 13, l. 18-25.

[123]. Rodriguez Deposition at p. 14, l. 14-20.

[124]. Castillo Deposition at p. 23, l. 6-8.

[125]. Castillo Deposition at p. 23, l. 13-17.

[126]. Jose Vega Deposition, p. 15, l. 10-22.

[127]. Castillo Deposition at p. 11, l. 19-21; p. 25, l. 10-13; l4-18.

[128]. Jose Vega Deposition, p. 5, l. 14-25.

      B.      All documentary exhibits must be exchanged before trial, except for rebuttal exhibits and those whose use cannot be anticipated.

      C.      A party requiring authentication of an offered exhibit must notify the offering counsel in writing within five days after the exhibit is listed and make available; failure to object in writing in advance of the trial concedes authenticity.

      D.      The Court will admit all exhibits listed in the Joint Pretrial Order into evidence unless opposing counsel files written objections supported by authority by the date listed on the Scheduling Order.

      E.      At trial, the first step will be the offer and receipt in evidence of exhibits.

11. **Witnesses.**

      A.      Attach a Witness List with the names and addresses of witnesses to be called, along with a brief statement of the nature of their testimony.

      B.      If other witnesses to be called at the trial become known, their names, addresses, and subject of their testimony will be reported to opposing counsel in writing as soon as they are known; this does not apply to rebuttal or impeachment witnesses.

12. **Settlements.** Settlement efforts have been exhausted, and the case will have to be tried.

13. **Trial.** The trial can be tried in 5 full days or less. There are no currently known logistical problems or witness unavailability issues. Exhibits will be provided to the Court.

14. **Attachments.** Each party must file as a separate document (captioned, signed by counsel, and with service certified) the following required attachments in duplicate:

      A.      For a Jury Trial:
                (1) Proposed questions for the *voir dire* examination.
                (2) Proposed charge, including instructions, definitions, and special interrogatories, with authority.

      B.      For a Non-Jury Trial:
                (1) Proposed findings of fact with agreed and contested ones separated.
                (2) Conclusions of law with authority.

Approved:

_____          1/27/20
Attorney-in-Charge, Plaintiff              Date

_____          _____
Attorney-in-Charge, Defendant              Date

### Certificate of Service/Conference

During the week prior to January 27, 2020, the undersigned contacted counsel for Defendants regarding the preparation of this document but received no response.

I certify that on January 27, 2020, a true and correct copy of the foregoing instrument was served on all parties of record via Notice of Electronic Filing from the Clerk of the Court.

/s/ Anthony O'Hanlon
**Anthony O'Hanlon**